Andrea Santarsiere (Idaho Bar # 8818)
10128 South 2000 West
Victor, ID 83455
(303) 854-7748 | Phone
zaccardi.andrea@gmail.com

*Local Counsel for Plaintiffs*

Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT 59715
tpreso@earthjustice.org
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Plaintiffs (pro hac vice application pending)*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| RALPH MAUGHAN, DEFENDERS OF WILDLIFE, WESTERN WATERSHEDS PROJECT, and WILDERNESS WATCH, | ) ) ) )  Case No. |
| Plaintiffs, | ) ) |
| v. | ) **COMPLAINT FOR DECLARATORY AND** ) **INJUNCTIVE RELIEF** ) |
| TOM VILSACK, U.S. Secretary of Agriculture; TOM TIDWELL, Chief, U.S. Forest Service; NORA RASURE, Regional Forester of Region Four of the U.S. Forest Service; KEITH LANNOM, Payette National Forest Supervisor; and VIRGIL MOORE, Director, Idaho Department of Fish and Game, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## INTRODUCTION

1.      This case challenges the U.S. Forest Service's disregard of its legal duties to protect the wilderness character of the Frank Church-River of No Return Wilderness ("Frank Church Wilderness") against degradation from a wolf extermination program undertaken by the Idaho Department of Fish and Game.  In mid-December 2013, the Idaho Department of Fish and Game ("IDFG") dispatched a hired hunter-trapper into a remote area of the Frank Church Wilderness around the Middle Fork of the Salmon River to exterminate two wolf packs that live entirely in the federally designated wilderness area—the Golden Creek and Monumental Creek packs—in an effort to inflate local elk populations for the benefit of commercial outfitters and recreational hunters.

2.      IDFG's wolf extermination program threatens the wilderness character of the largest forested wilderness in the continental United States by removing animals that are a wilderness icon and whose undisturbed presence in the wilderness is critical to maintaining ecological balance among wildlife species.  The large-scale removal of native wolves to manipulate elk populations contravenes the mandate of the 1964 Wilderness Act, which defines wilderness as "an area where the earth and its community of life are untrammeled by man" and requires federal wilderness areas to be "protected and managed so as to preserve [their] natural conditions" and "wilderness character."  16 U.S.C. §§ 1131(c), 1133(b).  Wolves are an essential element of the wilderness character of the Frank Church Wilderness—as the Forest Service itself previously asserted to this Court to justify a program of helicopter-assisted data collection on wolves in this wilderness area.  See Wolf Recovery Found. v. U.S. Forest Serv., 692 F. Supp. 2d 1264, 1266 (D. Idaho 2010) (quoting Forest Service decision memorandum describing "the importance of wolf recovery to enhancement of wilderness character" in the Frank Church

1

Wilderness).  Because of the importance of wolves to the wilderness character of the Frank Church Wilderness, the Service's governing land management plan prohibits actions to remove "problem animals" from the wilderness unless and until the Service undertakes specified interagency coordination procedures and secures the approval of the Regional Forester.  U.S. Forest Serv., Frank Church-River of No Return Wilderness Mgmt. Plan, at 2-28 (Dec. 2003).

3.      Nevertheless, when IDFG proposed its wolf extermination program in the Frank Church Wilderness, the Forest Service did not coordinate with any other federal agencies, seek Regional Forester approval, require a permit, provide public notice or solicit public comment, or engage in any other decision-making process to ensure that the wilderness character of the Frank Church Wilderness remains protected as Congress intended.  To the contrary, the Forest Service offered its apparent approval of the program—with no public involvement—by authorizing use of a Forest Service airstrip and cabin to provide access for IDFG's hired hunter-trapper and serve as a base of operations for the wolf extermination program.

4.      Federal law does not permit the Forest Service to disregard its duty to safeguard the wilderness character of the Frank Church Wilderness.  The Forest Service's authorization for IDFG to use the Service's cabin and airstrip for purposes of carrying out a wolf extermination program within the Frank Church Wilderness necessarily reflected approval of that program. That approval violated the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604(i); the Wilderness Act, 16 U.S.C. § 1133(b); the agency's own special-use permitting regulations, 36 C.F.R. Pt. 251; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C). Accordingly, it should be set aside by this Court pursuant to the Administrative Procedure Act as final agency action that was "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Alternatively, the Forest Service's failure to engage in any of the discrete

and mandatory review and approval processes required by these authorities before allowing

IDFG's wolf extermination program to proceed constitutes "agency action unlawfully withheld"

that should be compelled by this Court pursuant to 5 U.S.C. § 706(1).

## JURISDICTION AND VENUE

5.      Plaintiffs bring this action pursuant to the Administrative Procedure Act, 5 U.S.C.

§ 706(1)-(2) ("APA"), which waives the federal defendants' sovereign immunity, see id. § 702.

Plaintiffs may seek prospective injunctive and declaratory relief against the Director of the Idaho

Department of Fish and Game pursuant to Ex Parte Young, 209 U.S. 123 (1908).  See Nat'l

Audubon Soc'y v. Davis, 307 F.3d 835, 847 (9th Cir. 2002) ("Under the principle of Ex Parte

Young, private individuals may sue state officials for prospective relief against ongoing

violations of federal law," including for injunctive and declaratory relief).  This Court has

jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and may issue

a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

6.      Venue is proper under 28 U.S.C. § 1391(b)(2) and (e)(1)(B) because a substantial

part of the events or omissions giving rise to plaintiffs' claims occurred in this district.  Venue is

proper in the Eastern Division because the first named plaintiff in this action, Ralph Maughan,

resides in the Eastern Division.

## PARTIES

7.      Plaintiff Ralph Maughan is a Professor Emeritus of Political Science at Idaho

State University as well as an author, blogger, conservationist, avid outdoors traveler, and long-

time westerner.  As a member of the River of No Return Wilderness Council, Mr. Maughan was

part of the citizens' group that advocated for creation of, and helped establish the boundaries for,

the Frank Church Wilderness.  He has spent much of the ensuing 30 years actively pursuing

recreational activities and aesthetic enjoyment in the Frank Church Wilderness and interpreting the wilderness for the public through hiking guide books that he co-authored with his wife.  Mr. Maughan is also a long-time advocate for wolf restoration, recovery and conservation.  Mr. Maughan is a resident of Pocatello, Idaho.

8.     Plaintiff Defenders of Wildlife ("Defenders") is a non-profit conservation organization based in Washington, D.C., with offices across the country including Boise, Idaho and Missoula, Montana.  Defenders has more than one million members and supporters across the nation, including several thousand in Idaho, Montana, and elsewhere in the Northern Rockies.  Defenders is a science-based advocacy organization focused on conserving and restoring native species and the habitat on which they depend, and has been involved in such efforts since the organization's establishment in 1947.  Over the last three decades, Defenders has played a leading role in the recovery of wolves in the Northern Rockies.

9.     Plaintiff Western Watersheds Project is a non-profit conservation organization founded in 1993 with the mission of protecting and restoring western watersheds and wildlife through education, public policy initiatives, and litigation.  Headquartered in Hailey, Idaho, Western Watersheds Project has 1,400 members and field offices in Idaho, Montana, Utah, Wyoming, Arizona, and California.  Western Watersheds Project has maintained a public policy program for many years that is directed at advocating for statutory and regulatory protection of gray wolves in the Northern Rockies.

10.     Plaintiff Wilderness Watch is a non-profit conservation organization whose sole mission is the preservation and proper stewardship of lands and rivers in the National Wilderness Preservation System and the National Wild and Scenic Rivers System.  To that end, since 1989 Wilderness Watch has engaged in public policy advocacy, congressional and agency oversight,

public education, and litigation to promote sound stewardship of federal wilderness areas and Wild and Scenic River corridors.  Wilderness Watch is headquartered in Missoula, Montana.

11.     All plaintiffs have long-standing interests in preserving the wilderness character of federally designated wilderness areas in the Northern Rockies region, including the Frank Church-River of No Return Wilderness.  All plaintiffs likewise have long-standing interests in the recovery and preservation of the native gray wolf population in the Northern Rockies region.

12.     Plaintiff Ralph Maughan and members of each of the plaintiff conservation groups use the Frank Church Wilderness—including the Big Creek/Middle Fork area where the targeted wolf packs reside—for recreational pursuits such as hiking, camping, backpacking, snowshoeing, boating, hunting, fishing, wildlife viewing, and aesthetic enjoyment.  Members of the plaintiff groups work in industries, such as tourism and academia, that depend on the opportunity to view and study wolves in the Frank Church Wilderness.  Plaintiff Maughan and members of the plaintiff groups seek to view and hear wolves and locate signs of wolf presence in the Frank Church Wilderness, and defendants' challenged action will reduce their opportunity to do so.  The eradication of two resident wolf packs in the Frank Church Wilderness will cause irreparable ecological harm to the wilderness ecosystem, degrade the wilderness character of the area, and harm plaintiffs' ability to view and hear wolves and locate signs of their presence.  The legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, economic, recreational, scientific, educational, and wildlife preservation interests of plaintiff Maughan, the plaintiff organizations, and their members.

13.     Plaintiffs' aesthetic, conservation, economic, recreational, scientific, educational, wilderness enjoyment, and wildlife preservation interests have been, are being, and—unless their requested relief is granted—will continue to be adversely and irreparably injured by defendants'

5

failure to comply with federal law.  These are actual, concrete injuries traceable to defendants' conduct that would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

14.     Defendant Tom Vilsack is the United States Secretary of Agriculture.  In that capacity, Secretary Vilsack has supervisory responsibility over the United States Forest Service. Defendant Vilsack is sued in his official capacity.

15.     Defendant Tom Tidwell is the Chief of the United States Forest Service (the "Service"), a federal agency within the Department of Agriculture.  The Service is responsible for managing the Frank Church-River of No Return Wilderness and the Payette National Forest and for administering the National Forest Management Act, the National Environmental Policy Act, and the Wilderness Act therein.  Defendant Tidwell is sued in his official capacity.

16.     Defendant Nora Rasure is the Regional Forester for Region Four of the United States Forest Service, which encompasses the Payette National Forest and the Big Creek/Middle Fork area of the Frank Church Wilderness where IDFG's wolf extermination program is occurring.  Defendant Rasure is sued in her official capacity.

17.     Defendant Keith Lannom is the United States Forest Service Supervisor for the Payette National Forest, which encompasses the Big Creek/Middle Fork area of the Frank Church Wilderness where IDFG's wolf extermination program is occurring.  Defendant Lannom is sued in his official capacity.

18.     Defendant Virgil Moore is the Director of the Idaho Department of Fish and Game, which is responsible for regulating hunting and fishing on public lands within the State of Idaho.  Defendant Moore is sued in his official capacity.  Joinder of Defendant Moore is proper under Federal Rule of Civil Procedure 19(a).  See Nat'l Wildlife Fed'n v. Espy, 45 F.3d 1337,

1344-45 (9th Cir. 1995) (holding that purchasers of property were properly joined under Rule 19 in an action challenging a property transfer by federal agencies); Sierra Club v. Hodel, 848 F.2d 1068, 1077-78 (10th Cir. 1988) (holding that county was a necessary party in action challenging federal agency's failure to prohibit county's construction project because plaintiffs could not hope for complete relief if county was not enjoined from road construction during the pendency of the action and the federal agency would face a substantial risk of inconsistent obligations if the county, "unbound by the outcome in this case, sought declaratory or other relief against [the agency] at variance with the orders in the case"), overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh, 956 F.2d 970 (10th Cir. 1992).  Alternatively, joinder of Defendant Moore is proper under Federal Rule of Civil Procedure 20(a)(2).  See League to Save Lake Tahoe v. Tahoe Regional Planning Agency, 558 F.2d 914, 917-18 (9th Cir. 1977) (holding that permissive joinder of developers who received challenged agency approvals was proper).

## LEGAL FRAMEWORK

19.     Congress has charged the Forest Service with managing our National Forest lands and the protected Wilderness areas therein to preserve their wildlife, scenery, and resources for future generations.  To that end, the Service's management of our public lands is subject to a number of federal statutes that impose substantive constraints on the Service's activities and obligate the Service to undertake environmental review and public comment processes to ensure that decisions regarding the allocation of valuable resources are fully informed and transparent. The Service has also promulgated binding regulations that impose additional procedural and substantive requirements on its management decisions.  Together, these authorities limit the activities that may occur in our National Forests and Wilderness areas and require the Service to

conduct mandatory environmental and public review before lawful activities with significant environmental effects may go forward.

20.     **The National Forest Management Act**, 16 U.S.C. §§ 1600-1614 ("NFMA"), provides a framework for the Service's management of our National Forest lands.  NFMA requires the Service to create a comprehensive Forest Plan for each National Forest.  Id. § 1604(a).  All site-specific activities within a National Forest, including "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands," must conform to the governing Forest Plan.  Id. § 1604(i).

21.     The Forest Plan for the Payette National Forest, which contains the portion of the Frank Church Wilderness where the Golden Creek and Monumental Creek wolf packs reside, includes binding prescriptions for the Service's management of the Frank Church Wilderness. U.S. Forest Serv., Revised Land and Resource Mgmt. Plan for the Payette National Forest (2003).  The plan requires the Service to manage the Frank Church Wilderness according to the Wilderness Management Plan adopted by the Service for the area.  Id. at III-274.

22.     The Service's Wilderness Management Plan for the Frank Church-River of No Return Wilderness contains standards governing the Service's management of wildlife in the Wilderness area.  U.S. Forest Serv., Frank Church-River of No Return Wilderness Management Plan, at 2-28 (May 22, 2009).  Those standards require that "[c]ontrol of problem animals will be permitted only on a case-by-case basis in coordination with the Idaho Department of Fish and Game, [the U.S. Department of Agriculture's Animal and Plant Health Inspection Service]-Wildlife Services and the U.S. Fish and Wildlife Service, and with Regional Forester approval." Id.; see also id. Appendix I at 10 ("Wildlife damage control must be approved by the administering agency on a case-by-case basis.").

23.     In addition, an appendix to the Wilderness Management plan sets forth the Service's policy guidance on compliance with the Wilderness Act in the Frank Church Wilderness.  It recognizes that "[w]ildlife damage control in wilderness may be necessary" only "to protect Federally listed threatened or endangered species, to prevent transmission of diseases or parasites affecting other wildlife and humans, or to prevent serious losses of domestic livestock."  Id. Appendix I at 10.  Even when such wildlife control actions receive the necessary case-specific approvals, they must be implemented in a manner that "[d]irect[s] control at individual animals causing the problem" and must "[u]se only the minimum amount of control necessary to solve the problem."  Id.

24.     **The Wilderness Act.**  Congress enacted the Wilderness Act, 16 U.S.C. §§ 1131-1136, "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness."  16 U.S.C. § 1131(a).  To that end, the Wilderness Act provides for the establishment of a National Wilderness Preservation System and requires federally protected wilderness areas to "be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, [and] the preservation of their wilderness character…."  Id.  Congress defined "wilderness" as areas "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain" and which retain their "primeval character and influence."  Id. § 1131(c).

25.     The Wilderness Act charges the Service with "preserving the wilderness character" of designated wilderness areas within its jurisdiction, id. § 1133(b), and with "protect[ing] and manag[ing] [wilderness areas] so as to preserve [their] natural conditions," id. § 1131(c).  To implement these directives, the Service must resolve any resource conflicts in

wilderness areas to ensure that "wilderness values will be dominant" unless limited by the Wilderness Act, subsequent laws, or regulations.  36 C.F.R. § 293.2(c).  Additionally, the regulations command that in wilderness areas "[n]atural ecological succession will be allowed to operate freely to the extent feasible."  Id. § 293.2(a).

26.      **The Service's Special Use Permit Regulations.**  The Service's regulations provide mandatory direction for implementing its statutory authorities and define lawful public uses of National Forest lands and Wilderness areas therein.  Among other things, the regulations define uses of National Forest lands that qualify as "special uses" and generally require formal authorization from the Service—referred to as a "special use permit"—before they may proceed. 36 C.F.R. Pt. 251.

27.      "Special uses" include "[a]ll uses of National Forest System lands, improvements, and resources, except those authorized by the regulations governing sharing use of roads; grazing and livestock use; the sale and disposal of timber and special forest products…and minerals."  36 C.F.R. § 251.50(a) (internal citations omitted).

28.      With limited exceptions described below, no individual or entity may undertake a "special use" of National Forest lands without applying for and obtaining a special use permit from the appropriate Service official.  Id.  Further, the Forest Service must reject any special use proposal if the activity proposed is inconsistent with "the laws, regulations, orders, and policies establishing or governing National Forest System lands" or "with standards and guidelines in the applicable" forest plan.  Id. § 251.54(e)(1)(i)-(ii), (e)(2).

29.      The only "special uses" of National Forest lands that do not require application for a special use permit are: (1) "noncommercial recreational activities, such as camping,

picnicking, hiking, fishing, boating, hunting, and horseback riding"; and (2) noncommercial free-speech activities.  Id. § 251.50(c).

30.     In addition, the Service may grant an individual waiver from the special use permit requirement if, based on the special use permit application it receives, the appropriate official determines that the proposed use (1) "will have such nominal effects on National Forest System lands, resources, or programs that it is not necessary to establish terms and conditions in a special use authorization to protect National Forest System lands and resources or to avoid conflict with National Forest System programs or operations"; (2) "is regulated by a State agency or another Federal agency in a manner that is adequate to protect National Forest System lands and resources and to avoid conflict with National Forest System programs or operations"; or (3) is a routine operation or maintenance activity within an established right-of-way, ditch, or canal that is not located in a wilderness area.  Id. § 251.50(e).

31.     **The National Environmental Policy Act.**  The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, is "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a).  Congress enacted NEPA "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action."  Lands Council v. Powell, 395 F.3d 1019, 1026 (9th Cir. 2004).

32.     To that end, NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The EIS must describe the underlying purpose and need for the proposed action and "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action that are consistent with the identified

11

purpose and need.  40 C.F.R. §§ 1502.13, 1502.14.  The EIS must also evaluate a no-action alternative and all appropriate mitigation measures.  Id. § 1502.14(d), (f).  This mandate ensures that federal agencies will "carefully consider[] detailed information concerning significant environmental impacts" and guarantees that such information will be available to the public so that it "may also play a role in both the decisionmaking process and the implementation of that decision."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).

33.     To determine whether a proposed federal action will "significantly affect" the environment and thus require preparation of an environmental impact statement, the responsible agency may first conduct an environmental assessment, which is a less exhaustive study of the proposed action, its impacts, and alternatives.  40 C.F.R. §§ 1501.4, 1508.9.  If that assessment supports the conclusion that the proposed action is not a "major" one "significantly affecting the quality of the human environment," the agency must prepare a "finding of no significant impact" documenting that conclusion and its rationale.  Id. §§ 1501.4(e), 1508.13.

## FACTUAL BACKGROUND

## I.     THE FRANK CHURCH-RIVER OF NO RETURN WILDERNESS

34.     At 2,366,757 acres, the Frank Church-River of No Return Wilderness is the largest forested wilderness in the continental United States.  As plaintiff Ralph Maughan described in his hiking guide to the area, "[w]ith the exception of the subdued topography of Elk Creek on the south end of the wilderness and the vast plateau called Chamberlain Basin, the wilderness is a sea with waves of one steep ridge after another.  The major canyons of the Middle Fork and main Salmon twist through the mountains, in places almost 7,000 feet deep, deeper than the Grand Canyon."  Ralph Maughan & Jackie Maughan, The Hiker's Guide to Idaho 56 (Falcon Press 1984).

35.     The wilderness landscape is extremely diverse, ranging from semi-arid grass and brushlands at 2,000 feet of elevation along the lower main Salmon River to alpine summits above 10,000 feet in the Bighorn Crags.  However, the general character of the Frank Church Wilderness consists of extensive coniferous forest, scattered meadows, and open grassy slopes breaking into steep, rugged canyons.

36.     Congress recognized the "immense national significance" of "the famous 'River of No Return'" and the surrounding wildlands by creating the Frank Church-River of No Return Wilderness in 1980.  Central Idaho Wilderness Act of 1980, P.L. 96-312, 94 Stat. 948, 96th Cong. (1980).  Congress established the Frank Church-River of No Return Wilderness "in order to provide statutory protection for the lands and waters and the wilderness-dependent wildlife and the resident and anadromous fish which thrive within this undisturbed ecosystem."  Id. § 2(a)(2).

37.     Congress' concern for the area's wilderness-dependent wildlife was well founded, as the Frank Church Wilderness today hosts a great diversity and abundance of wildlife species. These include elk, bighorn sheep, mountain goats, mule deer, mountain lions, black bears, moose, and whitetail deer.  The wilderness also harbors smaller numbers of lynx, fishers, and wolverines.  And the Frank Church Wilderness is home to a wilderness icon—the gray wolf.

## II.     THE GRAY WOLF

38.     Gray wolves are native to central Idaho and the Northern Rockies region.  More than 350,000 gray wolves once inhabited the American West, but by 1925 the species had been eradicated from the region through shooting, trapping, and poisoning.  Gray wolves were among the first species to receive federal protection under the Endangered Species Act, 16 U.S.C. § 1531, et seq., when that statute was enacted in 1973.

39.     Wolves are social animals that normally live in closely bonded packs of two to twelve animals.  These family groups usually consist of a single breeding pair, their offspring from prior years, and an occasional unrelated wolf.  All pack members help feed, protect, and play with pups born to the pack.

40.     The federal government restored wolves to the Northern Rockies through a program initiated in 1995 to reintroduce wolves to appropriate habitats in the region, including the Frank Church Wilderness.  The Forest Service has explicitly recognized "the importance of wolf recovery to enhancement of wilderness character" in the Frank Church Wilderness.  Wolf Recovery Found., 692 F. Supp. 2d at 1266 (quoting Forest Service decision memorandum).  On that basis, the Forest Service in 2010 successfully defended before this Court a decision authorizing the Idaho Department of Fish and Game to dart and collar wolves from helicopters in the Frank Church Wilderness; the Court held that man's attempt "to restore the wilderness character of the area by returning the wolf" justified limited use of a helicopter for wilderness administration under the Wilderness Act, 16 U.S.C. § 1133(c).  692 F. Supp. 2d at 1268.

41.     Because it is a "keystone" species, the wolf's return has helped restore critical ecological balance in many portions of the Northern Rockies environment.  Wolves in the Northern Rockies primarily prey on wild ungulates such as elk, white-tailed deer, mule deer, moose, pronghorn antelope, and bison.  Wolves benefit the health of their prey species' populations by culling old, very young, injured, and diseased individuals and leaving the healthiest animals to reproduce.  The presence of wolves also discourages elk from browsing in riparian areas where they may encounter wolves, which reduces destruction of riparian trees and shrubs that control erosion and support communities of native birds, beavers, and other wildlife.  Wolves also prey aggressively on coyotes, which helps restore natural coyote population levels

and benefits small rodents, birds of prey (who feed on rodents), and pronghorn antelope (who are often preyed upon by coyotes).  The return of the wolf has also brought substantial economic benefit to the Northern Rockies region, as visitors come to see and hear wolves in the wild—including in the Frank Church Wilderness.

42.     In 2011, Congress stripped the gray wolf of Endangered Species Act protection. Since that time, the State of Idaho has managed a program of wolf hunting and trapping through the Idaho Department of Fish and Game.  IDFG's management of wolves through authorization of recreational hunting and trapping has reduced the state's wolf population; the most recent information available indicates that wolf numbers in Idaho dropped by 11 percent between 2011 and 2012.

## III.    WOLF EXTERMINATION IN THE FRANK CHURCH WILDERNESS

43.     The Idaho Department of Fish and Game determined in 2013 that it wished to inflate the population of elk within the Frank Church Wilderness to make more elk available for commercial outfitters and recreational hunters.  IDFG determined that wild gray wolves were preying on elk that might otherwise be available for hunters to shoot.  On information and belief, IDFG also determined that traditional management of the gray wolf population through recreational hunting and trapping was not resulting in enough wolf-kills to meet its objectives.

44.     On information and belief, IDFG hired a hunter-trapper in mid-December 2013 and dispatched him into the Frank Church Wilderness with instructions to completely eradicate two of the resident wolf packs—the Golden Creek pack and the Monumental Creek pack.  On information and belief, IDFG instructed its hunter-trapper agent to exterminate every individual wolf in these packs and agreed to pay him for doing so.

45.     The Monumental Creek and Golden Creek wolf packs reside entirely within a remote area of the Frank Church Wilderness located along Big Creek upstream from and continuing through its confluence with the Middle Fork of the Salmon River.  No member wolves of these packs have been collared for monitoring purposes and it is presently unknown how many wolves exist in the two packs.

46.     On information and belief, IDFG's hunter-trapper is carrying out IDFG's gray wolf extermination program in this Big Creek/Middle Fork area of the Frank Church Wilderness. This portion of the wilderness lies within the boundaries of the Payette National Forest.  Both the Wilderness area and the National Forest were designated as federally protected public lands by Congress and are managed by the U.S. Forest Service.

47.     On information and belief, IDFG's hunter-trapper accessed the Big Creek/Middle Fork area via the federally owned and managed airstrip at Cabin Creek and is utilizing a cabin owned and operated by the Forest Service as a base of operations for IDFG's wolf extermination program.

48.     IDFG requested the Forest Service's permission for IDFG's hunter-trapper to use these federal facilities for purposes of wolf extermination and the Service, by email, granted the permission requested.

49.     On information and belief, the Service did not undertake any environmental review, permitting review, or interagency consultation nor secure the approval of the Service's Regional Forester before authorizing IDFG's wolf extermination program and the IDFG hunter-trapper's use of the Service's airstrip and cabin.  Nor, on information and belief, did the Forest Service undertake any formal or informal process to ensure that IDFG's wolf extermination program in the Frank Church Wilderness will not degrade the area's wilderness character.

50.     Plaintiffs in this case challenge the Forest Service's failure to undertake environmental review, permitting review, and interagency coordination and secure the approval of the Regional Forester before allowing IDFG to undertake a large-scale wolf extermination program in the Frank Church-River of No Return Wilderness.  The Service's failure to undertake these mandatory review procedures before allowing elimination of native wildlife within a federally protected wilderness area violated the National Forest Management Act, the Wilderness Act, the National Environmental Policy Act, and the Service's special use permit regulations. IDFG's wolf extermination program may not lawfully proceed until the Service discharges its statutory and regulatory duties.

### FIRST CAUSE OF ACTION
(Violation of the National Forest Management Act)

51.     Plaintiffs hereby reallege and reincorporate Paragraphs 1 through 50.

52.     The National Forest Management Act ("NFMA") prohibits agency action that is inconsistent with the Forest Plan for the National Forest area at issue.  Ecology Ctr. v. Castaneda, 574 F.3d 652, 656 (9th Cir. 2009).  The Service's failure to comply with the governing Forest Plan is actionable under NFMA and the APA.  See id.; ONRC Action v. Bureau of Land Mgmt., 150 F.3d 1132, 1135 (9th Cir. 1998).

53.     As required by NFMA, the Service has adopted a Forest Plan for the Payette National Forest, which includes the areas of the Frank Church-River of No Return Wilderness where IDFG is carrying out its wolf extermination program.  16 U.S.C. § 1604(a).  That Forest Plan requires the Service to follow the Wilderness Management Plan for the Frank Church-River of No Return Wilderness.  U.S. Forest Serv., Revised Land and Resource Mgmt. Plan for the Payette National Forest, at III-274 (2003).

54.     That Wilderness Management Plan, in turn, establishes mandatory review and coordination procedures before activities to control "problem animals" may proceed within the Wilderness area.  Specifically, the Plan prohibits "[c]ontrol of problem animals" in the Wilderness unless and until the Service (1) coordinates with IDFG, the U.S. Department of Agriculture's Animal and Plant Health Inspection Service, and the U.S. Fish and Wildlife Service, and (2) obtains approval from the Service's Regional Forester.  U.S. Forest Serv., Frank Church-River of No Return Wilderness Management Plan, at 2-28 (May 22, 2009).

55.     The Service violated NFMA by failing to coordinate with the U.S. Department of Agriculture's Animal and Plant Health Inspection Service and the U.S. Fish and Wildlife Service, as required by the governing Forest Plan, before allowing IDFG to undertake a wolf extermination program within the boundaries of the Frank Church Wilderness.  See, e.g., Ecology Ctr., 574 F.3d at 656 (affirming that all agency action regarding National Forest management must comply with the governing Forest Plan); Lands Council, 395 F.3d at 1034, 1037 (vacating Service's action where inconsistent with the governing Forest Plan).

56.     The Service also violated NFMA by failing to obtain approval from the Regional Forester, as required by the governing Forest plan, before allowing IDFG to undertake a wolf extermination program within the boundaries of the Frank Church Wilderness.  See, e.g., Ecology Ctr., 574 F.3d at 656; Lands Council, 395 F.3d at 1034, 1037.

57.     The Service's authorization for IDFG to use the Service's cabin and airstrip for purposes of carrying out a wolf extermination program within the Frank Church Wilderness necessarily reflected authorization of that program.  The Service's authorization was arbitrary, capricious, and contrary to law and should be set aside because it did not conform to the coordination and approval procedures prescribed by the Forest Plan and mandated by NFMA.  5

18

U.S.C. § 706(2)(A); Lands Council, 395 F.3d at 1034, 1037 (vacating Service's action taken in violation of the governing Forest Plan).

58.    In the alternative, the interagency coordination and Regional Forester approval procedures prescribed by the Forest Plan are "discrete agency action[s]" that the Service "is required to take" by the Forest Plan and NFMA. Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004) (emphasis in original). Thus, the Service's failure to undertake these mandatory procedures constitutes "agency action unlawfully withheld or unreasonably delayed," which should be compelled by this Court under the APA, 5 U.S.C. §§ 704, 706(1). S. Utah Wilderness Alliance, 542 U.S. at 64; Gros Ventre Tribe v. United States, 469 F.3d 801, 814 (9th Cir. 2006).

## SECOND CAUSE OF ACTION
### (Violation of the Wilderness Act)

59.    Plaintiffs hereby reallege and reincorporate paragraphs 1 through 58.

60.    Congress has charged the Forest Service with managing the Frank Church-River of No Return Wilderness pursuant to the Wilderness Act. See Central Idaho Wilderness Act of 1980, P.L. 96-312, 94 Stat. 948, 96th Cong., § 5 (1980). Thus, the Service has a statutory duty to "preserv[e] the wilderness character" of the area. 16 U.S.C. § 1133(b); High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 646 (9th Cir. 2004). In defining wilderness and the Service's obligation to preserve it, Congress made clear that wilderness is characterized by minimal human influence on the landscape and its natural processes. See 16 U.S.C. § 1131(c) (defining wilderness as an area "where the earth and its community of life are untrammeled by man" and which retains its "primeval character and influence").

61.    To implement this statutory duty, the Service must administer wilderness areas to ensure that "[n]atural ecological succession will be allowed to operate freely to the extent

19

feasible." 36 C.F.R. § 293.2(a). When faced with conflicting uses of resources in a wilderness area, the Service must ensure that "wilderness values will be dominant" over other resource considerations unless limited by the Wilderness Act or other applicable law. Id. § 293.2(c). To constitute proper administration of a wilderness area, the Service's activities and those it authorizes "must further the wilderness character of the area." Wolf Recovery Found., 692 F. Supp. 2d at 1268.

62.     Gray wolves have been recognized as a fundamental aspect of the wilderness character of the Frank Church Wilderness. See Central Idaho Wilderness Act of 1980, P.L. 96-312, 94 Stat. 948, 96th Cong., § 2(a)(2) (1980) (congressional statement that its intent in establishing the Frank Church Wilderness was to protect "wilderness-dependent wildlife"); see also Wolf Recovery Found., 692 F. Supp. 2d at 1268 (describing federal government's effort to reintroduce wolves in the Frank Church Wilderness "to restore the area's wilderness character"). The Service itself has recognized the importance of wolves "to enhancement of wilderness character" in the Frank Church Wilderness. See Wolf Recovery Found., 692 F. Supp. 2d at 1266 (quoting the Service's decision memorandum for wolf collaring project, which described "the importance of wolf recovery to enhancement of wilderness character" in the central Idaho wilderness).

63.     To discharge its statutory duty under the Wilderness Act to preserve the wilderness character of the Frank Church Wilderness and protect the resident wildlife that contribute to that character, the Service has prescribed a process for reviewing proposals to remove "problem animals" from the wilderness. U.S. Forest Serv., Frank Church-River of No Return Wilderness Management Plan, at 2-28 (May 22, 2009). As described in ¶ 22, supra, that process prohibits actions to remove problem animals unless and until the Service undertakes

interagency coordination and obtains the approval of the Regional Forester.  Id.  The Service has further provided that, to comply with the Wilderness Act, actions to control "wildlife damage" are permissible only "to protect Federally listed threatened or endangered species, to prevent transmission of diseases or parasites affecting other wildlife and humans, or to prevent serious losses of domestic livestock."  Id. Appendix I at 10.  Even then, the action "must be approved by the administering agency on a case-by-case basis" and must be implemented in a manner that targets only individual animals causing the identified problem and involves the minimum amount of wildlife removal necessary to solve the problem.  Id.  IDFG's wolf extermination program does not comply with these substantive limitations on animal control actions in the Wilderness and was not subject to the review procedures the Service has prescribed.

64.     The Forest Service has abdicated entirely its duty under the Wilderness Act to protect the wilderness character of the Frank Church-River of No Return Wilderness by allowing large-scale extermination of gray wolves that are recognized as a critical aspect of the area's wilderness character and fundamental to maintaining its natural ecological balance.  16 U.S.C. § 1133(b).  Extermination of native wildlife—particularly an iconic species whose integral relationship to the area's wilderness character has been recognized by the Service and this Court—violates the statutory "mandate to protect the forests, waters and creatures of the wilderness in their natural, untrammeled state."  Wilderness Soc'y v. U.S. Fish & Wildlife Serv., 353 F.3d 1051, 1061-62 (9th Cir. 2003) (en banc) (emphasis added) (citing 16 U.S.C. § 1131). Therefore, the Service's authorization for IDFG to utilize the Service's cabin and airstrip for purposes of carrying out a wolf extermination program within the Frank Church Wilderness— which necessarily reflected authorization of that program—violated the Wilderness Act and

21

should be set aside as agency action that is "arbitrary, capricious,…or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

65.     In the alternative, the Service's abdication of its management duties under the Wilderness Act by allowing unlawful wolf removal and failing to undertake the discrete and mandatory interagency coordination and Regional Forester approval procedures prescribed by the Wilderness Management Plan constitutes "agency action unlawfully withheld or unreasonably delayed," which should be compelled by this Court under the APA, 5 U.S.C. §§ 704, 706(1).  S. Utah Wilderness Alliance, 542 U.S. at 64; Gros Ventre Tribe, 469 F.3d at 814.

**THIRD CAUSE OF ACTION**
(Violation of the Forest Service's Special Use Permit Regulations)

66.     Plaintiffs hereby reallege and reincorporate paragraphs 1 through 65.

67.     Under the Service's regulations, IDFG's non-recreational wolf extermination program within the Frank Church-River of No Return Wilderness constitutes a "special use" of National Forest lands requiring formal authorization from the Service.  36 C.F.R. § 251.50.  The only uses of National Forest lands that do not constitute special uses are those authorized by regulations governing (1) sharing use of roads, (2) grazing and livestock use, and (3) the sale and disposal of timber and special forest products and minerals.  Id. § 251.50(a).  The extermination of wolves does not fall within these categories and so qualifies as a special use.

68.     IDFG's wolf extermination program does not qualify for an exemption from the special use permit requirement under the Service's regulations.  The only special uses exempt from the permit requirement are (1) "noncommercial recreational activities, such as camping, picnicking, hiking, fishing, boating, hunting, and horseback riding"; and (2) noncommercial free-speech activities.  Id. § 251.50(c) (emphasis added).  Although IDFG's wolf extermination program involves hunting, it is not recreational.  Rather, IDFG has hired its hunter-trapper as an

employee or independent contractor and, on information and belief, has agreed to pay the hunter-trapper for killing wolves in the wilderness area.  Thus, the wolf extermination program is not exempt from the special use permit requirement under 36 C.F.R. § 251.50(c).

69.     Further, the Service may not rely on 36 C.F.R. § 251.50(e) to exempt IDFG's wolf extermination program from the special use permit requirement.  That provision allows the Service to determine that a specific proposed special use does not require a permit because the activity will have nominal effects on National Forest lands and resources or is regulated by another State or Federal agency in a manner that ensures adequate protection of National Forest lands and resources.  Id. § 251.50(e).  This provision is inapplicable because IDFG's wolf extermination program does not have the characteristics the provision requires.  First, the extermination of two entire packs of wolves—a keystone species whose contribution to the wilderness character of the Frank Church Wilderness the Service has recognized—would not have "nominal effects" on the relevant National Forest lands and their resources.  Second, the activity is not adequately regulated by another State or Federal agency, as IDFG's wolf extermination program is contrary to the Frank Church Wilderness management plan and the Service's own policy guidance for compliance with the Wilderness Act in connection with predator removal activities within a designated wilderness.

70.     The Service's authorization for IDFG to use the Service's cabin and airstrip for purposes of carrying out a wolf extermination program within the Frank Church Wilderness necessarily reflected authorization of that program.  The Service's authorization was arbitrary, capricious, and contrary to law and should be set aside under 5 U.S.C. § 706(2)(A) because neither IDFG's request to use those facilities nor the Service's authorization conformed to the Service's special use permitting regulations, 36 C.F.R. §§ 251.50, 251.54.

23

71.     In the alternative, the Service's special use permitting regulations prescribe "discrete agency action[s]" that the Service "is required to take" before special uses of National Forest lands may lawfully proceed.  S. Utah Wilderness Alliance, 542 U.S. at 64 (emphasis in original).  Therefore, the Service's failure to require a special use permit before allowing IDFG's wolf extermination program to proceed in the Frank Church Wilderness constitutes "agency action unlawfully withheld or unreasonably delayed," which this Court should compel under the APA, 5 U.S.C. §§ 704, 706(1).  S. Utah Wilderness Alliance, 542 U.S. at 64; see also Ctr. for Biological Diversity v. Veneman, 394 F.3d 1108, 1111 (9th Cir. 2003) (affirming that an agency's failure to take an "agency action" as defined in 5 U.S.C. § 551(13), which includes the issuance of a permit or license, is reviewable under § 706(1)).

### FOURTH CAUSE OF ACTION
(Violation of the National Environmental Policy Act)

72.     Plaintiffs hereby reallege and reincorporate paragraphs 1 through 71.

73.     The extermination of two packs of native gray wolves in the Frank Church-River of No Return Wilderness is a "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).   Thus, the Service's failure to prepare an environmental impact statement ("EIS")—or, at a minimum, an environmental assessment to determine the need for an environmental impact statement—violated NEPA.  Id.; 40 C.F.R. §§ 1501.4, 1508.9.

74.     The environmental effects of IDFG's lethal removal of two entire packs of wolves from the Frank Church-River of No Return Wilderness are significant within the meaning of NEPA.  See 40 C.F.R. § 1508.27 (defining significance for purposes of NEPA's EIS requirement).  As described in ¶¶ 40-41 and 62, supra, the significance of gray wolves to the wilderness character and ecological integrity of the Frank Church Wilderness is well established.

24

Moreover, the NEPA implementing regulations recognize that effects on protected and "ecologically critical" areas such as the Frank Church Wilderness indicate "significance" requiring environmental review.  40 C.F.R. § 1508.27(b)(3).

75.     The fact that IDFG, and not the Service, is carrying out the wolf extermination program is immaterial to the Service's statutory obligation under NEPA.  Under NEPA, "major Federal action" triggering the EIS requirement "includes actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.  The definition embraces "projects and programs entirely or partly…assisted,…regulated, or approved by federal agencies."  Id. § 1508.18(a).  Where, as here, a project undertaken by a non-federal actor requires a federal permit, "issuance of that permit does constitute major federal action and the federal agency involved must conduct an [environmental assessment] and possibly an EIS before granting it.  Ramsey v. Kantor, 96 F.3d 434, 444 (9th Cir. 1996) (citations omitted).

76.     As described above, IDFG's wolf extermination program constitutes a special use of National Forest lands requiring a permit from the Service before it may lawfully proceed.  That the Service failed to require a special use permit does not relieve its NEPA obligations, as "[i]t is clear from federal regulations that federal inaction can count as federal action for purposes of triggering the EIS requirement under NEPA."  Ramsey, 96 F.3d at 445; see 40 C.F.R. § 1508.18.

77.     In addition, the Service's failure to undertake the interagency coordination and Regional Forester approval processes required by the governing Forest Plan, NFMA, and the Wilderness Act constitutes "agency action unlawfully withheld or unreasonably delayed" and is reviewable under § 706(1) of the APA.  Therefore, the Service's failure to undertake these

mandatory review processes before allowing IDFG's wolf extermination program to proceed in the wilderness constitutes "major Federal action" triggering the agency's environmental review responsibilities under NEPA.  40 C.F.R. § 1508.18; <u>Ramsey</u>, 96 F.3d at 445.

78.     Alternatively, the Service's authorization for IDFG to utilize the Service's cabin and airstrip for purposes of carrying out a wolf extermination program within the Frank Church Wilderness necessarily reflected authorization of that program.  The Service's decision to grant that authorization without undertaking NEPA review is arbitrary, capricious, and contrary to law and should be set aside.  5 U.S.C. § 706(2)(A).

<b>PRAYER FOR RELIEF</b>

Therefore, plaintiffs respectfully request that this Court:

79.     Grant temporary, preliminary, and permanent injunctive relief to prohibit the Forest Service and Defendant Moore from conducting, authorizing, or facilitating any wolf extermination program or activities in the Frank Church Wilderness pending their compliance with governing law;

80.     declare that the Forest Service violated NFMA, the Wilderness Act, Forest Service special use permitting regulations, and NEPA by allowing IDFG to conduct its wolf extermination program in the Frank Church Wilderness;

81.     set aside the Forest Service's approval of IDFG's wolf extermination program in the Frank Church Wilderness or, in the alternative, compel the Forest Service to undertake unlawfully withheld agency action to protect the wilderness character of the Frank Church Wilderness from degradation due to IDFG's wolf extermination program;

82.     award plaintiffs their reasonable fees, costs, and expenses, including attorneys fees, associated with this litigation; and

26

83.     grant plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 6th day of January, 2014.


_/s/Andrea Santarsiere
Idaho Bar # 8818
10128 South  2000 West
Victor, ID 83455
(303) 854-7748 | Phone
zaccardi.andrea@gmail.com

*Local Counsel for Plaintiffs*

Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT 59715
tpreso@earthjustice.org
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Plaintiffs (pro hac vice application pending)*